# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CRIMINAL ACTION |
| v. ) | |
| ) | No. 10-20108-01-KHV |
| ALEJANDRO SANCHEZ-SOSA, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## MEMORANDUM AND ORDER

On August 10, 2010, a grand jury indicted defendant on one count of conspiracy to distribute and possession with intent to distribute more than 50 grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii) and 18 U.S.C. § 2 (Count 1) and two counts of distributing more than 5 grams of methamphetamine in violation of 21 U.S.C. §§841(a)(1) and(b)(1)(B)(viii) and 18 U.S.C. § 2 (Counts 2 and 3). See Indictment (Doc. #1). This matter is before the Court on Defendant's Motion To Suppress Evidence (Doc #63) filed February 8, 2011. On February 10, 2011, the Court held an evidentiary hearing on defendant's motion. For reasons set forth below, the Court overrules the motion to suppress.

## Facts

At the suppression hearing, Sergeant William Babbitt, with the Police Department in Platte City, Missouri, testified as follows.

On July 27, 2010, at approximately 11:10 p.m., Police Officer Russell Nicholson observed a white 2001 Dodge Intrepid parked in the middle of the McDonald's parking lot on Prairie View

Road in Platte City, Missouri.[1] He noticed that two occupants of the vehicle were slouched down, attempting to conceal themselves. He also saw a nervous individual standing behind the vehicle talking on a cell phone. Officer Nicholson radioed to the dispatcher that he was going to make a "suspicious vehicle check." Sergeant Babbitt heard the call, and he responded as a back-up officer. The restaurant dining room had closed at 11:00 p.m., but the drive-through was still open. Sergeant Babbitt testified that the McDonald's parking lot had been the scene of narcotics and weapon-related offenses in the past.[2]

When Sergeant Babbitt arrived approximately 30 to 45 seconds after the dispatch call, Officer Nicholson's marked patrol car was parked cross-wise (with the lights off) behind the white vehicle. Sergeant Babbitt testified that nothing impeded the white vehicle from leaving the parking lot. Sergeant Babbitt immediately spoke with Officer Nicholson, who told him that he had asked for identification and received Mexican identification cards from the three individuals.[3] While Officer Nicholson called to run record checks with the U.S. Immigration and Customs Enforcement ("ICE"), Sergeant Babbitt contacted the occupants of the vehicle.

Sergeant Babbitt identified Omar Navarrete-Tejeda as the driver, and asked him to exit the car. Sergeant Babbitt conducted a pat-down search for officer safety, and then asked

---

[1] The parking lot was otherwise vacant, except for a row of cars parked right next to the restaurant.

[2] Sergeant Babbitt testified that he had personally made 10 or 11 drug arrests and five to seven weapons arrests there over the past five years. He testified that the arrests involved individuals of different races and that no one race predominated. He also testified that it was unusual and "very suspicious" for a vehicle to be parked there at that time of night.

[3] Sergeant Babbitt testified that during the entire encounter, he never saw Officer Nicholson brandish a weapon or use a loud or antagonistic tone of voice. As he conceded on cross-examination, however, Sergeant Babbitt did not observe the initial interaction between Officer Nicholson and the occupants of the car.

Navarrete-Tejeda why he was parked in the lot. Navarrete-Tejeda stated that he was waiting for his friend "Jeff" but could not provide Jeff's last name or current address. When Sergeant Babbitt asked Navarrete-Tejeda how long he had known Jeff, he replied that he had known him for four years and that Jeff was his boss. Sergeant Babbitt then asked Navarrete-Tejeda for his own address and he replied that he did not know the address but that he lived in Olathe. Sergeant Babbitt asked Navarrete-Tejeda if any narcotics or weapons were in the vehicle, and Navarrete-Tejeda replied "no." Sergeant Babbitt then asked Navarrete-Tejeda for consent to search the car. Navarrete-Tejeda paused for a moment and then replied, "yes, yes, yes, go ahead – there's nothing in there." During the course of this questioning, Sergeant Babbitt never brandished his weapon, and except for the pat-down search, never touched Navarrete-Tejeda. At this point, Sergeant Babbitt had not told Navarrete-Tejeda that he was under arrest, and had not placed him in handcuffs.

Sergeant Babbitt asked the front seat passenger (later identified as Alejandro Sanchez-Sosa) and the right back seat passenger (later identified as Salvador Villegas-Gonzalez) to exit the vehicle. After he conducted pat-down searches on each, Sergeant Babbitt searched the vehicle. He found a clear plastic bag, which he suspected to be methamphetamine, under the center console area. Immediately after that, Nicholson told Sergeant Babbitt that according to ICE, all three men were illegally in the United States.[4] The officers arrested all three men and transported them to the Platte County Detention Center for processing.

A search of the vehicle information revealed that none of the occupants were listed as owners. Defendant did not assert any ownership or possessory interest in the vehicle during the

---

[4] Officer Nicholson also learned that Navarrete-Tejeda did not have a valid driver's license.

encounter with the police officers or at any time since.

Defendant seeks to suppress all evidence obtained in the search of the car.

## **Analysis**

The Fourth Amendment of the United States Constitution protects persons and their houses, papers and effects against unreasonable searches and seizures. See U.S. Const. amend. IV. Evidence obtained in violation of a person's Fourth Amendment rights may not be admitted into evidence against that person. Here, defendant seeks to suppress all evidence obtained in the search of the car. He argues that the officers did not have reasonable suspicion or probable cause to stop the vehicle and investigate the occupants. The government maintains that the officers' initial contact with the occupants was consensual. The government asserts that shortly after the initial contact, the officers developed reasonable suspicion to detain the occupants and then obtained voluntary consent to search the car. In the alternative, the government argues that even if the search was illegal, the evidence obtained is admissible against defendant under the derivative evidence doctrine.

The Tenth Circuit has defined "three types of police-citizen encounters: '(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.'" United States v. Brown, 496 F.3d 1070, 1074 (10th Cir. 2007) (quoting United States v. Davis, 94 F.3d 1465, 1467-68 (10th Cir. 1996)). What starts out as a consensual encounter may evolve into an investigative detention, and, of course, a detention may evolve into an arrest. See United States v. White, 584 F.3d 935, 944-45 (10th Cir. 2009). This court must analyze the encounter between the occupants of the vehicle and the officers

-4-

from its inception and determine whether the requisite level of suspicion existed at each stage. Id. at 945.

**I. Initial Encounter**

An encounter between a citizen and police that does not rise to the level of a seizure does not implicate the Fourth Amendment; although the Fourth Amendment "proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation" with law enforcement. United States v. Johnson, 364 F.3d 1185, 1188 (10th Cir. 2004) (quoting Florida v. Bostick, 501 U.S. 429, 439 (1991)). Even if police do not have an individualized basis for suspecting a citizen of wrongdoing, they may nonetheless approach the citizen, ask questions, ask for identification, and ask to search the person's property, so long as they "do not convey a message that compliance with their requests is required." Bostick, 501 U.S. at 434-35. The critical inquiry, for purposes of determining whether a seizure occurred, is whether a reasonable person, in view of all the circumstances, would have believed that he or she was free to leave or otherwise end the encounter. See, e.g., United States v. Harris, 313 F.3d 1228, 1234 (10th Cir. 2002). The Court must apply this "reasonable person" standard from the viewpoint of an innocent person – a recognition that someone who encounters police while concealing contraband is less likely than the hypothetical "reasonable person" to consider himself free to leave. See Bostick, 501 U.S. at 438.

Courts consider numerous factors in determining whether a police-citizen encounter amounts to a seizure, including the location of the encounter; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not

they have specifically advised the defendant at any time that he has the right to terminate the encounter or refuse consent. United States v. Lopez., 443 F.3d 1280, 1284 (10th Cir. 2006). This list is non-exclusive, however, and no single factor is dispositive. United States v. Rogers, 556 F.3d 1130, 1137-38 (10th Cir. 2009). Based on the totality of the circumstances, the Court must determine whether "a reasonable person would have believed that he was not free to terminate" the encounter with police. Id.

Here, Sergeant Babbitt testified that Officer Nicholson decided to make a "suspicious vehicle check" on a car parked in a lot known for drug trafficking, at 11:10 p.m., shortly after the adjoining McDonald's lobby had closed. Officer Nicholson approached the parked car in a well-lit business parking lot in public view. The record contains no information concerning Officer Nicholson's demeanor when he first made contact with the car's occupants, or any other details regarding the initial, albeit brief, interaction between Officer Nicholson and the occupants. By the time Sergeant Babbitt reached the scene less than a minute or so later, Officer Nicholson had obtained identifications for the three occupants.[5] The government has not produced sufficient facts to allow the Court to determine whether, in the totality of the circumstances, the initial encounter was consensual.[6] The Court therefore turns to whether the officers had reasonable suspicion which justified the initial contact.

**II. Investigative Detention**

---

[5] The government correctly points out that a police officer does not seize an individual merely by asking to see identification. See United States v. Olivares-Campos, 276 Fed. Appx. 816, 820 (10th Cir. 2008).

[6] The government concedes that any consensual encounter ended when Officer Nicholson took the identification to his car. See Lopez, 443 F.3d at 1285.

Law enforcement officers may stop and briefly detain a person for investigative reasons if the officer has a reasonable suspicion that criminal activity may be afoot. United States v. Sokolow, 490 U.S. 1, 7 (1989). Reasonable suspicion requires a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. United States v. Arvizu, 534 U.S. 266, 274 (2002).

Under Terry, the court applies a two-prong test for determining the reasonableness of investigative detentions. First, the detention must be "justified at its inception." Terry v. Ohio, 392 U.S. at 20. An officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." Id. at 21. Those facts must tend to show that the detainee has committed or is about to commit a crime. See Johnson, 364 F.3d at 1189. Second, the officer's actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. Under both prongs, the reasonableness of the officer's suspicions is judged by an objective standard taking into account the totality of the circumstances and information available to the officer, including the area where the detention took place and the officer's own experience. Depending on the totality of the circumstances, ambiguous behavior, susceptible to an innocent interpretation, may give rise to a reasonable suspicion of criminal activity. See Sokolow, 490 U.S. at 8; Oliver v. Woods, 209 F.3d 1179, 1188 (10th Cir. 2000). "[A]s long as an officer has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory

detention even if it is more likely than not that the individual is not involved in any illegality." Johnson, 364 F.3d at 1194.

Courts may not evaluate and reject each contributing factor in isolation; reasonable suspicion can exist even if each individual observation is susceptible of innocent explanation. United States v. Guerrero, 472 F.3d 784, 787 (10th Cir. 2007). Factors that are entirely innocent when taken separately can support a lawful detention if, taken together, they reasonably suggest the presence of illegal conduct. United States v. Wallace, 429 F.3d 969, 975-76 (10th Cir. 2005).

In analyzing whether a given set of factors gives rise to the requisite reasonable suspicion, the Court must judge the officer's conduct in light of common sense and ordinary human experience but also must "grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." Id. (citations omitted). The government bears the burden of proving the reasonableness of the officer's suspicion. United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998); see also United States v. Lutz, 207 F. Supp.2d 1247, 1255 (D. Kan. 2002) (government must show traffic stop justified by reasonable articulable suspicion of illegal activity).

Although Officer Nicholson did not testify at the hearing, Officer Babbitt testified to what observations led Officer Nicholson to initiate the suspicious vehicle check: (1) the vehicle was parked in the McDonald's parking lot at 11:10 p.m., after the restaurant lobby had closed; (2) the lot was known for drug trafficking activity; (3) two occupants of the vehicle were slouched down; and (4) a nervous individual was standing behind the vehicle talking on the phone.[7] Courts

---

[7] Although Officer Nicholson did not testify at the suppression hearing, Sergeant Babbitt testified concerning what Officer Nicholson had told him about his interactions with the occupants of the vehicle. Defendant repeatedly objected to Sergeant Babbitt's testimony as hearsay, and the Court overruled the objections. The Supreme Court has long held that hearsay testimony
(continued...)

recognize that a car parked in the lot of a closed establishment can contribute to an officer's reasonable suspicions. See United States v. Dawdy, 46 F.3d 1427, 1430 (8th Cir. 1995) (driver and passenger parked after 10:00 p.m. at back of otherwise deserted parking lot of pharmacy burglarized several times in recent past). Further, Sergeant Babbitt testified that in the last five years, he has been involved in 10 or 11 drug arrests and five to seven firearms arrests in the McDonald's parking lot. Although the fact that a given area is well known for criminal activity does not by itself justify a Terry stop, it is a factor that weighs in favor of reasonable suspicion. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (although presence in area of criminal activity not enough to support reasonable suspicion, officers not required to ignore relevant characteristics of location in

---

⁷(...continued)
is admissible at suppression hearings. See United States v. Matlock, 415 U.S. 164, 173 (1974) (rules of evidence applicable in criminal jury trials do not govern at court hearings to determine pre-trial evidentiary matters, such as admissibility of evidence at trial); see also United States v. Merritt, 695 F.2d 1263, 1270 (10th Cir. 1982) (police permitted to offer hearsay testimony to support reasonable suspicion); Fed. R. Evid. Rule 104.

The Court notes that in Crawford v. Washington, 541 U.S. 36, 54 (2004), the Supreme Court held that use of testimonial hearsay statements against a defendant at a criminal trial violates defendant's right to confrontation and cross-examination unless the witness is unavailable to testify and defendant had a prior opportunity for cross-examination. The Tenth Circuit has indicated, however, that Crawford does not apply to pretrial suppression hearings. See United States v. Garcia, 324 Fed. Appx. 705, 708-09 (10th Cir. 2009) (no plain error in allowing hearsay evidence at hearing on motion to suppress) (citing United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004) (decided after Crawford, but without citing it, holding hearsay testimony admissible at hearing on motion to suppress); cf. United States v. Bustamante, 454 F.3d 1200, 1202 (10th Cir. 2006) (Crawford concerned use of testimonial hearsay statements *at trial* and not whether court may rely on hearsay statements at sentencing). The Tenth Circuit in Garcia noted that the few federal courts which have squarely addressed the issue have found that Crawford does not apply to suppression hearings. See Garcia, 324 Fed. Appx. at 708-09 (citing Washburn v. United States, No. 3:05-CV-774 RM, 2006 WL 3715393, at *4 (N.D. Ind. Dec. 14, 2006) (finding defendant's reliance on Crawford misplaced); United States v. Thompson, No. 4:05CR00161 HEA(AGF), 2005 WL 3050634, at *6 (E.D. Mo. Nov. 14, 2005) (Crawford does not change long-standing precedent that permits use of hearsay in preliminary proceedings dealing with admissibility of evidence).

determining whether circumstances warrant further investigation); United States v. Johnson, 212 F.3d 1313, 1316 (D.C. Cir. 2000) (high crime area among relevant contextual considerations in Terry analysis). Officer Nicholson saw the occupants "slouch" in an apparent attempt not to be seen. Although slouching in an automobile, absent any other suspicious circumstances, is insufficient to warrant an investigatory stop, it is a factor to consider. United States v. Brown, 209 Fed. Appx. 450, 454 (5th Cir. 2006) (applying to circumstances outside of border context). Further, "nervousness" in response to the presence of police can contribute to reasonable suspicion. See United States v. Johnson, 364 F.3d 1185, 1192 (10th Cir. 2004) (nervousness is pertinent factor that reasonable law enforcement officer would analyze in investigating possible crimes; district court erred in not including nervous behavior in evaluating initial Terry stop); United States v. Neff, No. 09-40071-01-JAR, 2010 WL 58904, at *5 (D. Kan. Jan. 5, 2010) ("nervous, evasive behavior" pertinent in determining whether stop supported by "reasonable suspicion). Viewed through the lens of an experienced police officer, these circumstances added up to a reasonable suspicion that the occupants of the vehicle were involved in criminal activity, specifically, drug trafficking.

A stop based on reasonable suspicion must not become an unnecessarily lengthy detention. United States v. Rice, 483 F.3d 1079, 1083 (10th Cir. 2007). When an officer is conducting a lawful investigative detention, he may request identification and an explanation of the detainee's presence in the area, and may detain the individual until the investigation is completed. See Oliver v. Woods, 209 F.3d 1179, 1189 (10th Cir. 2000). If the officer continues to question the driver in the absence of either reasonable suspicion or consent, then "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms." Guerrero-Espinoza, 462 F.3d 1302, 1310 (10th Cir. 2006).

Here, within about a minute of the initial stop, Officer Nicholson determined that the occupants all carried Mexican identification cards and that the driver did not possess a driver's license. Within a few more minutes, Sergeant Babbitt had conducted a pat-down search for officer safety and asked Navarrete-Tejeda why he was parked in the lot.[8] Navarrete-Tejeda stated that he was waiting for his friend, "Jeff," but did not know Jeff's last name or current address. Sergeant Babbitt asked him how long he had known Jeff; he replied for four years, and that Jeff was his boss. Sergeant Babbitt then asked Navarrete-Tejeda for his current address and he only knew the city. These responses did not dispel the reasonable suspicion that the occupants of the vehicle might be engaged in illegal activity, and added to the reasonable suspicion to continue the detention. See, e.g., United States v. Manuel 791 F. Supp. 265, 269 (D. Kan. 1992) (fact that defendant could not give police officer last name and address of person he was visiting contributed to reason for continued questioning).

### III. Consent To Search The Vehicle

After the encounter described above, Sergeant Babbitt asked if any narcotics or weapons were in the vehicle, and Navarrete-Tejeda stated "no." Sergeant Babbitt then asked Navarrete-Tejeda for consent to search the car, and Navarrete-Tejeda paused for a moment and then replied, "yes, yes, yes, go ahead – there's nothing in there." The government argues that his consent to search was voluntary.

To establish that consent was voluntary, the government must (1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given and (2) prove that this consent was given without implied or express duress or coercion. United States v. McRae,

---

[8] Defendant does not argue that Sergeant Babbitt was not justified in conducting the pat-down of Navarrete-Tejeda.

81 F.3d 1528, 1537 (10th Cir. 1996). Whether a consent is voluntary is a question of fact to be determined from the totality of the circumstances. See United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993). Relevant factors include "the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification; and absence of other members of the public." United States v. Hill, 199 F.3d 1143, 1147-48 (10th Cir. 1999) (in context of consensual encounter); see Soto, 988 F.2d at 1557-58 (evaluating similar factors in context of investigative detention). No one factor is dispositive. See Soto, 988 F.2d at 1557. Although Tenth Circuit law on consent to search while detained during a traffic stop is somewhat unclear, compare Guerrero-Espinoza, 462 F.3d at 1309 & n.7 with McRae, 81 F.3d at 1537 (10th Cir. 1996), an individual can give voluntary consent even though he was detained at the time he consented.

Here, Officer Nicholson had possession of Navarrete-Tejeda's identification when Sergeant Babbitt asked for consent to search the vehicle. Sergeant Babbitt testified that he never drew his gun and had not told Navarrete-Tejeda that he was under arrest. Sergeant Babbitt testified that Navarrete-Tejeda expressly consented to the search. Based on these facts, the government argues that Navarrete-Tejeda's consent was valid. See McRae, 81 F.3d at 1537 (consent valid even though officer retained his license and rental papers where consent was clear and unequivocal and no evidence of duress or coercion). The Court notes that the government did not offer evidence concerning Sergeant Babbitt's demeanor during his interaction with the occupants. See United States v. Thompson, 546 F.3d 1223, 1228 (10th Cir. 2008) (noting importance of officer's tone in determining whether encounter was coercive). Defendant had ample opportunity to cross-examine Sergeant Babbitt, however, and the record contains no suggestion of coercive behavior. A single

officer – Sergeant Babbitt – asked Navarrete-Tejeda a brief series of relevant questions, and then asked for consent to search. Navarrete-Tejeda paused for a moment, and then replied, "yes, yes, yes, go ahead – there's nothing in there." Based on all of the circumstances, the Court finds that the search was based on voluntary consent.

### IV. Derivative Evidence Doctrine

In the alternative, the government argues that even if the vehicle search was not justified, the methamphetamine found in the car is admissible as to defendant under the derivative evidence doctrine.

The government first notes that defendant was not the owner or driver of the car, and thus lacked a reasonable expectation of privacy in the vehicle. Where defendant lacks the requisite possessory or ownership interest in a vehicle to directly challenge a search of a vehicle, however, he may still contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of an illegal detention. United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000). A nonowner-passenger who lacks a reasonable expectation of privacy may challenge admission of evidence found in a vehicle only if the evidence would not have been found "but for" his own unlawful detention, seizure or arrest. United States v. DeLuca, 269 F.3d 1134-35 (10th Cir. 2001). To do so, the passenger must point to facts which show that the evidence he seeks to suppress is a product of his own unlawful detention. See id. To challenge the admission of the evidence, defendant must show (1) that the detention violated his Fourth Amendment rights and (2) a factual nexus between the illegality and the challenged evidence. Nava-Ramirez, 210 F.3d at 1131.

Here, the Court has already found that the initial and continuing detention of the vehicle and its occupants was based on reasonable suspicion. Further, once Officer Nicholson completed the identification check, the officers were justified in arresting the occupants for being in the country

-13-

illegally. Thus, defendant cannot show that he was illegally detained. Further, he cannot show that his detention was the "but for" cause of the search. See DeLuca, 269 F.3d at 1133 (defendant must show that the evidence he seeks to suppress would never have been found but for his, and only his, unlawful detention).

The Court therefore overrules defendant's motion to suppress the evidence which officers obtained as a result of the stop.

**IT IS THEREFORE ORDERED** that defendant's Motion To Suppress Evidence (Doc. #63) filed February 8, 2011 be and hereby is **OVERRULED**.

Dated this 14th day of February, 2011 at Kansas City, Kansas.

> s/ Kathryn H. Vratil
> KATHRYN H. VRATIL
> United States District Judge